**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Deborah L. Little, : Case No. 3:08CV 1046
:
    Plaintiff, :
:
vs. :
:
Commissioner of Social Security, : **MEMORANDUM DECISION**
: **AND ORDER**
    Defendant. :

Plaintiff seeks judicial review of a final decision of the Commissioner denying her application for Supplemental Social Security Income (SSI) under Title XVI of the Social Security Act (the Act), 42 U. S. C. § §§ 1381, *et seq*. and 405(g). Pending are briefs filed by the parties (Docket Nos. 19 & 22). For the reasons set forth below, the decision of the Commissioner is affirmed.

### I. PROCEDURAL BACKGROUND

Plaintiff applied for SSI on October 17, 2003, alleging that her disability began on February 1, 1998 (Tr. 67-69). Her application was denied initially and on reconsideration (Tr. 48-51, 53-55). A hearing was held in Lima, Ohio, on November 16, 2005, before Administrative Law Judge (ALJ) Barbara L. Beran. Plaintiff, represented by counsel, and Vocational Expert (VE) Carl Hartung, appeared and testified (Tr. 453). The ALJ rendered an unfavorable decision finding that Plaintiff was not disabled (Tr.

18-36). The Appeals Council denied Plaintiff's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner (Tr. 6-8). Plaintiff filed a timely request for judicial review pursuant to 42 U.S.C. §§ 405(g).

## II. JURISDICTION

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 830, 832 -833 (6th Cir. 2006).

## III. FACTUAL BACKGROUND

### A.     Plaintiff's Testimony

Plaintiff, a 50 year old female, was 5'1" tall and weighed 235 pounds. She had completed the ninth grade (Tr. 461, 462). Plaintiff's source of income included general assistance, food stamps and a medical card (Tr. 464). She had resided in Kenton, Ohio, with a disabled friend since 2003 (Tr. 460, 461).

Except for a one month period as a child care provider ending in April 2005, Plaintiff was last employed outside of the home in September 2003. Plaintiff was not paid for this service (Tr. 464, 465). Plaintiff had no driver's license. She used public transportation and friends to transport her to her destinations (Tr. 463).

Plaintiff had a mental breakdown in the 1980's (Tr. 468). During the last ten years (1995-2005), Plaintiff panicked when exposed to people (Tr. 465). Attacks of panic resulted in an inability to breathe (Tr. 466). She underwent counseling to address her fears (Tr. 467). She also tried different medications for depression (Tr. 468).

Tripping over a telephone cord, Plaintiff broke her right ankle and fractured her left ankle. As

a consequence of the fall, she could not walk very far and her body ached continuously (Tr. 469). On a typical day, Plaintiff's pain was equal to a seven or eight on a ten-point ascending scale with zero signifying no pain (Tr. 471).

Plaintiff also suffered from back pain (Tr. 471). Surgery relieved some of pressure from the base of Plaintiff's spine (Tr. 472). Plaintiff's physician had administered nerve stimulators to reduce the degree or intensity of pain (Tr. 475)

Plaintiff had up to two migraine headaches weekly. Occasionally, the headaches persisted for two days. The severity of her headaches was described as a nine on an ascending ten-point scale with zero signifying no pain (Tr. 471, 476). Some relief was provided up to thirty minutes after taking her medication. In addition, Plaintiff would lie down and avoid exposure to light and noise (Tr. 485).

Plaintiff estimated that she could sit for approximately twenty minutes and stand for approximately ten minutes without difficulty. She could walk less than five minutes (Tr. 477). She could lift/carry five pounds (Tr. 478). Plaintiff explained that hand cramps made it difficult to manipulate her fingers and hold "things." She dropped cups and plates and after playing three or four hands of cards, her hands started involuntarily "crinkling up" (Tr. 486, 487). Plaintiff smoked one pack of cigarettes per day (Tr. 462). Exposure to smoke, extreme heat and dust resulted in breathlessness (Tr. 487, 488).

During an average day, Plaintiff retired at 2:00 or 3:00 A.M. and arose between 8:00 and 9:00 A.M., placed her order with her roommate for purchases at the store or requested that he get the mail (Tr. 478, 479). She admitted that she could feed herself but her hygiene suffered because of depression (Tr. 479). There were times during a twenty-four hour period that Plaintiff did not move from the couch except to use the bathroom (Tr. 488).

Plaintiff did not make her bed, prepare any meals, wash clothing, sweep, mop, vacuum, take out the trash, grocery shop or maintain the lawn (Tr. 480). She did clean the hamster cage once monthly (Tr. 481). Occasionally, Plaintiff read. She spent eight to ten hours daily watching television (Tr. 481). She would bring a seek-and-find book if she had to sit for extended periods of time. She saw a friend once weekly (Tr. 482). Plaintiff saw her children once or twice annually (Tr. 483).

**B.     Vocational Expert Testimony**

Characterizing a hypothetical claimant of Plaintiff's age, education and without any past relevant work experience, limited to simple, one to two-step repetitive tasks, without strict production quotas and minimal contact with others, the hypothetical plaintiff could perform 50% of medium level work, 50% of light level work and 35% of sedentary level work (Tr. 490). The total number of unskilled medium level jobs in the Northwest Central Ohio region was approximately 31,000. The total number of unskilled light jobs in the region was approximately 19,830 and at the sedentary level there were approximately 10,480 (Tr. 491).

If the work were limited to lifting and carrying up to ten pounds frequently, up to twenty pounds occasionally, with only occasional climbing, stooping, kneeling, couching, crawling, the number of unskilled light jobs would not be affected. Specific examples of jobs that would fall into the parameters of this hypothetical included hand packagers, stock clerks and food preparation workers. At the light level, the number of such positions totaled 578, 491 and 585, respectively (Tr. 491). At the sedentary level, there were jobs available such as assembler, service station attendant and counter/rental clerks.

Assuming that the hypothetical plaintiff could lift five pounds frequently, fifteen pounds occasionally, walk only occasionally and stand without limitation, the light work would be reduced by 20% and sedentary work would be unaffected. The stock clerk and food preparation jobs would be

eliminated because of the walking. Instead, an order filler would supplement the list of available jobs at the light level (Tr. 492).

If Plaintiff's statements were deemed totally credible and the allegations and limitations were supported by substantial medical evidence, there would be no jobs that she could perform (Tr. 493). Dropping objects on a frequent basis, described as dropping objects 66% of the workday, would eliminate the ability to work. Dropping things a couple times during the day would affect the food preparation work (Tr. 494).

## IV. MEDICAL EVIDENCE

On April 12, 2000, George J. Pfaff, a licensed social worker, diagnosed Plaintiff with major depressive disorder, panic disorder with agoraphobia and some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (Tr. 235). He noted the presence of several mental health symptoms, some lasting as long as eighteen years (Tr. 238). At this juncture in Plaintiff's care, he recommended a medication review and outpatient counseling (Tr. 236).

Commencing in October 2001, Plaintiff presented to the Linden Medical Center for treatment of a myriad of impairments including breathlessness, cephalgia, chronic low back pain, chronic obstructive pulmonary disease, depression, dysthymia, elevated triglycerides, gastrointestinal reflux, increased blood sugar, sinusitis, spinal stenosis and uncontrolled hypertension. Typically during these visits, Plaintiff's health behaviors were reviewed, her laboratory tests reviewed, her chronic medications were reviewed and her medications were refilled as needed (Tr. 167-169, 171-200, 280-282, 285-297, 300-303, 305,423-442).

Dr. William Washington, a family practice physician in practice at the Linden Medical Center,

addressed specific symptoms related to anxiety, bronchitis, chronic low back pain, depression, hypertension, elevated lipid levels and gastrointestinal reflux (279-312, 422-444).  The course of drug therapy and tests conducted to manage the diabetes mellitus neuropathy were well-documented (Tr. 164-166, 298, 299, 428).

The levels of glucose in Plaintiff's red blood cells measured by the A1C test were elevated to approximately twice the normal range on November 27, 2003 (Tr. 207).  The glucose levels were elevated in May 2004, but not to the extent of elevation found during the November 2003 A1C test (Tr. 205).  On January 2, 2006, the levels were again elevated but not as high as the levels detected in May 2004 (Tr. 444).

Upon conducting a psychiatric review, Dr. Karen M. Terry, Ph.D., confirmed the diagnoses of a major depressive disorder, recurrent, borderline intellectual functioning and panic disorder with agoraphobia (Tr. 212, 213, 214).  On February 10, 2004, Dr. Terry opined that Plaintiff had moderate limitations in her ability to:  (1) understand and remember, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) perform activities within a schedule, (5) sustain an ordinary routine, (5) work in coordination with or proximity to others, (6) complete a normal workweek, (7) interact appropriately with the general public, (8) get along with coworkers, (9) accept instructions and (10) respond appropriately to criticism.

Dr. Terry determined that Plaintiff had no significant limitations in her ability to:  (1) remember locations, (2) understand and remember short and simple instructions, (3) carry out very short and simple instructions, (4) make simple related decisions or ask simple questions, (5) maintain socially appropriate behavior, (6) respond appropriately to changes in a work setting, (7) be aware of normal hazards, (8) travel in unfamiliar places and (9) set realistic goals (Tr. 222, 224).

Dr. Anton Freihofner, M.D., determined that Plaintiff could (1) occasionally lift and/or carry up to fifty pounds, (2) frequently lift and/or carry up to twenty-five pounds, (3) stand and/or walk about six hours in an eight-hour workday; (4) sit about six hours in an eight-hour workday, (5) push and/or pull on an unlimited basis and (6) frequently kneel, crouch, crawl or climb using a ramp or stairs (Tr. 228, 229). Dr. Freihofner did not find any manipulative limitations but he suggested that Plaintiff avoid concentrated exposure to fumes, odors, dust and gas (Tr. 230).

On January 7, 2004, Dr. Meg Metts, Ph. D., diagnosed Plaintiff with a panic disorder with agoraphobia, major depressive disorder, borderline intellectual functioning and serious symptoms or any serious impairment in social, occupational, or school functioning (Tr. 123).

Although there was evidence of depression, on March 1, 2004, Dr. Dorsey L. Gilliam, an occupational medicine specialist, determined that Plaintiff was able to sit and stand at will, walk moderately, lift and carry up to five pounds frequently and up to fifteen pounds occasionally, handle objects easily and hear and speak well (Tr. 130). The results from the pulmonary function test conducted on March 1, were normal (Tr. 133). The manual muscle test results showed that Plaintiff could raise against maximal resistance using her shoulders, elbows, wrists, fingers, hips, knees and feet. Her grasp, however, was abnormal bilaterally (Tr. 134). The range of motion in her cervical spine, shoulders, elbows, wrists, hips, knees, ankles and hands/fingers was normal (Tr. 136, 137). Plaintiff was unable to move her dorsolumbar spine to its full potential (Tr. 136).

No flow disturbances were noted in either internal carotid artery on July 15, 2004 (Tr. 202). The results from the artery study conducted on July 19, 2004, showed normal resting ankle-brachial indexes and doppler waveforms (Tr. 201).

Dr. Stephen M. Blum interpreted the magnetic resonance imaging (MRI) of Plaintiff's lumbar

spine on September 21, 2004, and determined that there was evidence of disc herniation superimposed upon disc bulging at L4-L5. Clearly, multilevel facet joint degenerative changes were present (Tr. 245). Plaintiff was treated for right knee pain on December 10, 2004. The X-rays showed a normal right knee (Tr. 310).

In February 2005, Dr. Louise A. Doyle, an optometrist, conducted a complete eye examination due to Plaintiff's underlying diabetes. Although Plaintiff's visual fields were normal, she suspected the presence of hypertensive retinopathy and glaucoma (Tr. 248-256).

Plaintiff presented to a hospital's emergency department on: (1) January 12, April 4 and May 5, 2005, for treatment of low back pain (Tr. 246, 263, 265, 270, 272), (2) February 2005 for treatment of a headache (Tr. 257, 259), (3) March 2005 for treatment of an infected ingrown toenail (Tr. 260, 262), (4) May 2005 for treatment of difficult breathing on exertion (Tr. 273), (5) September 2005 for a suicide attempt (Tr. 320) and (6) October 2005 for an acute fracture and soft tissue swelling of the foot after a fall (Tr. 342, 343, 347). The echocardiogram administered during the May hospital visit showed a trace of mitral regurgitation and mild tricuspid regurgitation (Tr. 273).

Plaintiff was evaluated and/or served at the Pain Control Consultants from May 10, 2005 through March 7, 2006 (Tr. 357-412). She began pain management with a complaint that her lower back, right hand and right knee ached (Tr. 406). Her complaints expanded to include the upper back, buttocks, hips, right elbow, left wrist, left hand and right ankle pain (Tr. 274). Even after an injection at the nerve root of an agent designed to destroy nerves and interrupt pain, Plaintiff still experienced pain and stiffness (Tr. 360).

The results from the chest X-ray administered on September 20, 2005 were normal (Tr. 323).

The interpretation from the MRI of the lumbar spine administered on May 20, 2005, was correlated with the interpretation of the MRI taken on September 21, 2004. The newer MRI showed minimal reparative response of the lumbar spine (Tr. 278). Bacteria collected from the L5-S1 disc of Plaintiff's spine on September 24, 2005, showed no cell incubation after five days (Tr. 329-340).

## V. STANDARD OF DISABILITY

To establish entitlement to SSI, a claimant must prove that she or he is incapable of performing substantial gainful activity due to a medically determinable physical or mental impairment that can be expected to result in death or to last for at least twelve months. 42 U. S. C. § 1382c (a)(3)(A) (2000); 20 C. F. R. § 416.909 (Thomson Reuters/West 2009). The claimant must show that his or her impairment results from anatomical, physiological or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U. S. C. § 1382c (a)(3)(C); 20 C. F. R. §§ 416.913, 416.928 (Thomson Reuters/West 2009).

To determine disability, the ALJ uses a five-step sequential evaluation process. 20 C. F. R. § 416.920 (a) - (f) (Thomson Reuters/West 2009). The ALJ considers: (1) whether claimant is working and whether that work constitutes substantial gainful activity, (2) whether claimant has a severe impairment, (3) whether claimant has an impairment which meets or equals the durational requirements listed in Appendix 1 of Subpart P, Regulations No. 4, (4) whether claimant can perform past relevant work, and (5) if claimant cannot perform his/her past relevant work, then his/her residual functional capacity, age, education and past work experience are considered to determine whether other jobs exist in significant numbers that accommodate him/her. 20 C. F. R. § 416.920 (Thomson Reuters/West 2009).

The claimant bears the burden of proof through the first four steps of the inquiry, at which point the burden shifts to the Commissioner at step five. *Combs. v. Commissioner of Social Security,* 459 F.

3d 640, 643 (6th Cir. 2006). At step five, the Commissioner must identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity and vocational profile. *Wilson v. Commissioner of Social Security*, 378 F. 3d 541, 548 (6th Cir. 2004) (*citing Jones v. Commissioner of Social Security,* 336 F.3d 469, 474 (6th Cir. 2003)).

## VI. ALJ'S DETERMINATIONS

After careful consideration of the entire record, the ALJ made the following findings:

1. Plaintiff had not engaged in any disqualifying substantial gainful activity since the alleged onset date of February 1998. In fact, it appeared that Plaintiff had not worked at all in the relevant past, except for a stint as a babysitter.

2. Plaintiff had a severe combination of impairments that were best described as obesity, a history of right ankle and left foot fracture, lumbar degenerative disc disease status-post discectomy in September 2005, hypertension with hypertensive retinopathy, diabetes mellitus Type II, gastrointestinal reflux disease, chronic obstructive pulmonary disease, diagnoses of affective and anxiety disorders and a diagnosis of borderline intellectual functioning.

3. Plaintiff did not have an impairment or combination of impairments that was listed in or medically equal to one listed in Appendix 1, Subpart P, Regulation Number 4.

4. Plaintiff had the residual functional capacity to lift/carry ten pounds frequently and twenty pounds occasionally. She could sit, stand and/or walk, with normal breaks, throughout an eight-hour workday. She could occasionally climb, stoop, kneel, crouch and crawl. She should avoid concentrated exposure to respirator irritants. Mentally, she was limited to low stress work, which was defined as simple tasks without strict production quotas, a fast pace or more than minimal contacts with others.

5. Plaintiff's testimony was credible regarding her limitations to the extent that she has a severe impairment. However, Plaintiff's testimony was not credible to show that she was incapable of all work activity at any exertional level.

6. Plaintiff had no past relevant work.

7. Plaintiff was 51 years of age with a limited education. Considering her impairments, limitations and vocational profile, Plaintiff has been able to perform a significant number of jobs existing in the national economy at all times through the date of the decision. Plaintiff was not under a disability as defined in the Act at any time through November 22, 2006.

(Tr. 35-36).

## VII.  STANDARD OF REVIEW

Pursuant to 42 U. S. C. § 405(g), this Court has jurisdiction to review the Commissioner's decisions. *Cutlip v. Secretary of Health and Human Services*, 25 F. 3d 284, 286 (1994). Judicial review of the Commissioner's decisions is limited to determining whether such decision is supported by substantial evidence and whether the Commissioner employed the proper legal standards. *Id*. (*citing Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)). Substantial evidence is more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* (*citing Kirk v. Secretary of Health & Human Services*, 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied,* 103 S. Ct. 2428 (1983)). The reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Id*. (*citing Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir.1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.1984)).

In determining the existence of substantial evidence, the reviewing court must examine the administrative record as a whole. *Id*. (*citing Kirk*, 667 F.2d at 536). If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, *See Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir.1983), and even if substantial evidence also supports the opposite conclusion, *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc).

## VIII.  DISCUSSION

Plaintiff asserts five errors made by the ALJ in rendering his decision denying her benefits. First, the ALJ failed to adopt a favorable finding of the consultative physician or explain why the opinion was

11

discounted. Second, the state agency physician report was incomplete. Third, the ALJ failed to evaluate a treating source's statements consistent with 20 C. F. R. § 416.927(d). Fourth, the ALJ failed to sustain the burden of proof at step five of the sequential evaluation. Fifth, Plaintiff is entitled to a finding of disability pursuant to Grid Rule 201.09.

Defendant seeks an order of this Court affirming the Commissioner's final decision. In addition, Defendant presents the following arguments. First, the ALJ's residual functional capacity finding accounted for Plaintiff's limitations dealing with stress. Second, the ALJ reasonably relied on the state agency reviewing psychologists' residual functional capacity finding and did not improperly reject Plaintiff's moderate limitations. Third, the ALJ reasonably rejected the opinion of the state agency physician because it was unsupported by objective medical evidence and was inconsistent with the record as a whole.

**1. DID THE ALJ FAIL TO ADOPT A FAVORABLE FINDING OF THE CONSULTATIVE PHYSICIAN OR EXPLAIN WHY THE OPINION WAS DISCOUNTED?**

Consultative Examiner Dr. Metts determined that Plaintiff had a marked inability to cope with stress. While the ALJ acknowledged this marked limitation, he failed to explain why this limitation that was consistent with the other psychological evidence in the record, was rejected. Plaintiff contends that her case should be remanded for proper evaluation of the opinion of Dr. Metts concerning her marked inability to handle stress.

The Regulations mandate that ALJs are not bound by any findings made by the state agency medical consultants. 20 C. F. R. § 404.1527(f)(2)(i) (Thomson Reuters/West 2009). However, when an ALJ considers findings of a state agency medical consultant or other program physician, the ALJ will evaluate the findings using relevant factors, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided

by the physician or psychologist, and any other factors relevant to the weighing of the opinions.  20 C. F. R. § 404.1527(f)(2)(ii) (Thomson Reuters/West 2009).  Unless the treating physician's opinion is given controlling weight, the administrative law judge *must explain* in the decision the weight given to the opinions of a state agency medical or psychological consultant or other program physician or psychologist, as the ALJ must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us.  20 C.F.R. § 404.1527(f)(2)(ii) (emphasis added); *see* 20 C.F.R. § 416.927(f)(2)(ii) (Thomson Reuters/West 2009).

The ALJ's decision contains no indication that he did not give controlling weight to the opinions of Dr. Metts.  He properly acknowledged the state agency decisions but he was neither bound by the state agency consultant's opinion that Plaintiff could not cope with stress nor was he required to explain the weight given that decision.  Since the ALJ complied with the procedure in the regulations, the case need not be remanded for reevaluation of Dr. Metts' opinion.

**2.     WAS THE STATE AGENCY PHYSICIAN REPORT INCOMPLETE?**

Plaintiff contends that this case should be remanded to the Commissioner to obtain a completed mental residual functional capacity assessment from Dr. Terry.  Dr. Terry's narrative portion of the mental residual functional capacity (RFC) assessment does not address all of the limitations included in the function-by-function analysis.

The residual functional capacity assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, SSR 96-8p 1996 WL 374184, *7 (July 2, 1996).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities

13

in an ordinary work setting on a regular and continuing basis, and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id.* There is nothing in the Commissioner's regulations or ruling that requires the ALJ to make findings concerning each of the limitations listed in the summary conclusions portion of the review form utilized in assessing claimant's mental residual functional capacity. TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p (July 2, 1996).  20 C. F. R. § 404.1513(d) (Thomson Reuters/West 2009).

In this case, Dr. Terry considered Plaintiff's mental health, explaining in narrative form, how she arrived at her conclusions. She cited instances in the record that led her to conclude that Plaintiff could perform sustained work provided she was subjected to no stress, quotas or fast paced performance. Dr. Terry further opined that Plaintiff could perform sustained work on a continuing basis if the work were routine, simple to perform and repetitive and permitted superficial contact with coworkers and supervisors. Plaintiff was able to adapt to routine changes if the changes were explained to her. Dr. Terry found Plaintiff's allegations of panic attacks credible and consistent with the medical record. No explanation on how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved was required.

The Magistrate finds that Section III, Functional Capacity Assessment, of the Mental Residual Functional Capacity Assessment, was intended to supplement Section I, Summary Conclusions. The adjudicator is not instructed to conduct an evaluation of all the capacities identified in the summary

conclusions. Focusing on her discipline, psychology, Dr. Terry's narrative portion of the mental residual functional capacity assessment elaborated on her summary conclusions, clarifying limitation and function. Since she complied with the rules, remand to the Commissioner for purposes of obtaining additional consideration by Dr. Terry is unnecessary.

**3.    DID THE ALJ FAIL TO PROPERLY EVALUATE A TREATING SOURCE'S STATEMENTS?**

Dr. Gilliam evaluated Plaintiff at the request of the state agency in March 2004. Dr. Gilliam concluded that Plaintiff could sit and stand at will, walk moderately and lift three to five pounds frequently and up to fifteen pounds occasionally. The ALJ rejected this opinion even though it was not inconsistent with the evidence. Plaintiff contends that the ALJ failed to evaluate the opinion consistent with 20 C. F. R. § 416.927(d).

Regardless of its source, the fact finder must evaluate every medical opinion received. 20 C. F. R. § 416.927(d) (Thomson Reuters/West 2009). Generally, more weight is given to the opinion of a source who has examined the claimant than to the opinion of a source who has not examined the claimant. 20 C. F. R. § 416.927(d) (1) (Thomson Reuters/West 2009). A treating source is likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. 20 C. F. R. § 416.927(d) (2) (Thomson Reuters/West 2009). Good reasons will be given in the notice of decision for the weight given the treating source's opinions based on: (i) length of the treatment relationship and the frequency of examination; (ii) nature and extent of the treatment relationship; (iii) supportability; (iv) consistency; (v) specialization; or (vi) other relevant factors that the claimant may bring to the attention of the fact finder.

20 C. F. R. § 416.927(d) (2) (i)-(vi) (Thomson Reuters/West 2009).

Although the ALJ attributes controlling weight to Dr. Washington's opinions, he examined Plaintiff's relationship with Dr. Gilliam. He found that Dr. Gilliam examined Plaintiff once. The nature and the extent of the relationship with Dr. Gilliam were limited to a review of Plaintiff's history and subjective complaints (Tr. 128-138). Dr. Gilliam's RFC was based on pulmonary function studies, X-rays and manual muscle testing (Tr. 23). His diagnoses were not inconsistent with the record as a whole.

The Magistrate finds that the ALJ did examine the opinion evidence produced by Dr. Gilliam consistently with the instructions for evaluating and weighing the medical opinions for examining sources. Plaintiff has not shown that the ALJ failed to evaluate the opinion consistent with 20 C. F. R. § 416.927(d).

4. **THE JOBS AVAILABLE TO PLAINTIFF ARE LESS THAN THE SIZE OF THE SEDENTARY OCCUPATIONAL BASE.**

Plaintiff contends that when the VE incorporated limitations imposed by Dr. Gilliam, the hypothetical claimant could only perform 20% of the unskilled light occupational jobs available and 35% of the unskilled sedentary jobs available. This means that the number of jobs available is less than the size of the sedentary occupational base.

The term "occupational base" means the approximate number of occupations that an individual has the RFC to perform considering all exertional and nonexertional limitations and restrictions. (See SSR 83-10, "TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK--THE MEDICAL-VOCATIONAL RULES OF APPENDIX 2" (C.E. 1981-1985, p. 516).) A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed in Table No. 1. TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK-IMPLICATIONS OF A

RESIDUAL FUNCTIONAL CAPACITY FOR LESS THAN A FULL RANGE OF SEDENTARY WORK, SSR 96-9P, 1996 WL 374185, *3 (July 2, 1996). When there is a reduction in an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administratively noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work: the occupational base will be "eroded" by the additional limitations or restrictions. SSR 96-9p, at *4. However, the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. SSR 96-9p, at *4. There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded. SSR 96-9p, at *4.

If an individual is unable to lift ten pounds or occasionally lift and carry items like docket files, ledgers, and small tools throughout the workday, the unskilled sedentary occupational base will be eroded. SSR 96-9p, at *6. The extent of erosion will depend on the extent of the limitations. SSR 96-9p, at *6. The full range of sedentary work requires that an individual be able to stand and walk for a total of approximately two hours during an 8-hour workday. SSR 96-9p, at *6. If an individual can stand and walk for a total of slightly less than two hours per 8-hour workday, this, by itself, would not cause the occupational base to be significantly eroded. SSR 96-9p, at *6. Conversely, a limitation to standing and walking for a total of only a few minutes during the workday would erode the unskilled sedentary occupational base significantly. SSR 96-9p, at *6.

Dr. Gilliam opined that Plaintiff was able to sit and stand at will, walk moderately, lift and carry up to five pounds frequently, and up to ten pounds occasionally (Tr. 130). The ability to perform a full range of sedentary work requires the ability to lift no more than ten pounds at a time, occasionally lift

17

or carry articles like docket files, ledgers and small tools and walk and stand occasionally. 20 C. F. R. § 404.1567(a) (Thomson Reuters/West 2009). Actually, the limitations imposed by Dr. Gilliam are consistent with an ability to perform a full range of sedentary work. The ALJ accepted, however, the VE's analysis that Plaintiff was capable of performing only 35% of unlimited sedentary work. Even with this limitation, there is no absence of a sedentary occupational base. Under the regulations, the mere inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability.

**5. IS PLAINTIFF ENTITLED TO A FINDING OF DISABILITY UNDER THE GRID?**

Plaintiff suggests that the ALJ use her age and the inability to perform a full range of sedentary, unskilled work to place her in a category on the grid that will mandate a disability finding. She contends that pursuant to Grid Rule 201.09, Appendix 2, Subpart P, Part 404, she is entitled to a finding of disability.

The grid rules, promulgated by the Social Security Administration and set forth at 20 C.F.R. § 404.1569, are used to determine whether significant numbers of other jobs exist for the claimant or whether that claimant is disabled when the characteristics of the claimant exactly match the characteristics in one of the rules. *Wright v. Massanari,* 321 F.3d 611, 615 (6th Cir. 2003) (*citing Hurt v. Secretary of Health & Human Services,* 816 F.2d 1141, 1142-43 (6th Cir.1987) (per curiam)). When the impairments do not precisely match any specific rule, the claimant's RFC is used as the appropriate framework to determine whether the claimant is disabled. *Id.* (*citing Kirk, supra*, 667 F.2d at 530). The ALJ cannot rely, however, on the grids alone where the claimant's nonexertional limitation significantly restricts the range of available work. *Jordan v. Commissioner of Social Security*, 548 F. 3d 417, 424 (6th Cir. 2008) (*citing Abbott v. Sullivan,* 905 F. 2d 918, 926-927 (6th Cir. 1990)). Nonexertional impairments

traditionally encompass mental, sensory and environmental limitations. *Cole v. Secretary of Health and Human Services*, 820 F. 2d 768, 772 (6th Cir. 1987).

Here, the ALJ found that Plaintiff's mental impairment as well as her environmental sensitivities restricted the range of available work. The ALJ properly declined to rely on any portion of the grids in finding the availability of other work Plaintiff could perform.

## VIV.  CONCLUSION

For these reasons, the decision of the Commissioner is affirmed and the case is dismissed.
**IT IS SO ORDERED**.

        /s/ Vernelis K. Armstrong
United States Magistrate Judge


Date: September 10, 2009